**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: | Case No.17-31145 |
| Pawn America Minnesota, LLC, | Chapter 11 Case |
| Debtor. | |

| | |
|---|---|
| In re: | Case No.17-31146 |
| Pawn America Wisconsin, LLC, | Chapter 11 Case |
| Debtor. | |

| | |
|---|---|
| In re: | Case No.17-31147 |
| Exchange Street, Inc., | Chapter 11 Case |
| Debtor. | |

**DECLARATION OF BRADLEY K. RIXMANN**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND INITIAL MOTIONS**

I, Bradley K. Rixmann, declare as follows:

1. I am the founder and President of Pawn America Minnesota, LLC, Pawn America Wisconsin, LLC, and Exchange Street, Inc. (collectively "Pawn America" or the "Debtors").

2. I submit this declaration (the "Declaration") to assist this court and parties in interest in (a) understanding Pawn America, its operations, and its capital structure; (b) understanding the circumstances related to the commencement of the chapter 11 cases; and

(c) in support of: (i) Pawn America's petitions for relief under chapter 11 of title 11 of the United States Code filed on the date hereof (the "Petition Date"); and (ii) the relief requested by Pawn America in various initial motions filed with the Court along with the petitions for relief.

3. Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge of Pawn America's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of Pawn America's management and advisors, or my opinion based on my experience, knowledge, and information concerning Pawn America's operations and financial condition. I am authorized to submit this Declaration on behalf of Pawn America, and, if called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4. Pawn America seeks to use the chapter 11 process, like many other established retailers, to "right-size" its stores and its geographic footprint in a way that will allow it to operate profitably in the years and decades to come. Through the bankruptcy process, Pawn America expects to close several unprofitable stores, revisit the terms of existing leases in stores where profitability has been a challenge, reduce and/or amortize its debt service obligations, and streamline its operations.

5. Pawn America started its business by opening a modest, 900-square-foot store in Robbinsdale, Minnesota, in 1991. Pawn America then opened twelve additional locations in Minnesota between 1994 and 2000, expanded into Sioux Falls, South Dakota in 2006, and opened a Fargo, North Dakota location in 2008. Pawn America also opened seven stores in Wisconsin between 2008 and 2013, and added Minnesota locations in Inver Grove Heights, St. Paul, and Mankato in 2012 and 2013.

2

6. Pawn America currently has twenty-three stores located in Minnesota, Wisconsin, South Dakota, and North Dakota supported by more than 440 workers who provide customers with pawn, sale, and trade services at each location. In fiscal year 2016, on a consolidated basis, Pawn America generated approximately $64 million in gross revenue and approximately $665,000 in EBITDA.

7. Pawn America is more than a retailer. It is proud to be an active and integral part of the communities it serves. Pawn America has received awards and recognition for its initiatives in community service. Among other things, Pawn America received the Jefferson Award for Corporate Philanthropy in 2009 and the FiSCA Activa Award for outstanding community involvement in 2010. Pawn America has also received recognition for its founding of, or significant involvement in programs to support U.S. troops overseas, fund and expand the Hennepin County Sheriff Foundation, and provide tens of thousands of meals for underprivileged children annually through the Boys & Girls Club.

A. **CHALLENGES IN THE RETAIL SECTOR**

8. It is no secret that retail is undergoing major changes and experiencing very significant financial stress. In 2017 alone, several major retailers have sought bankruptcy protection, including Gordmans, hhgregg, RadioShack, Gander Mountain, BCBG Max Azria, MC Sports, Eastern Outfitters, Wet Seal, The Limited, and Payless. Other retailers, including Macy's, Kmart, Sears, JCPenney, Game Stop, and Abercrombie & Fitch, have announced store closures to reduce their geographic footprint.

9. Pawn America is enduring many of the same challenges as its fellow retailers: in-store traffic decline, reductions of revenue in important sales categories, significant changes to

3

traditional retail trends, expensive leases, and an increased consumer emphasis on internet-based transactions.

**B.    HOW PAWN AMERICA'S BUSINESS WORKS**

10.    Pawn America engages in transactions involving jewelry, consumer electronics, musical instruments, tools, recreation items, art and collectibles, DVDs, video games, tablets, laptops, and a wide variety of other items.

11.    Three categories of transactions occur at Pawn America stores:

   a.    Customers may sell one or more items to Pawn America.

   b.    Customers may purchase (or trade for) one or more items in Pawn America's inventory.

   c.    Customers may obtain a short-term collateral loan from Pawn America and provide one or more items as collateral to secure repayment.

12.    Outright purchase and sale transactions are familiar to all consumers, but the third category of transactions described above, which are sometimes called "collateral loans," are less universal.

13.    In a collateral loan transaction, money is lent in exchange for items of value and the loan amount is based on the value of the item exchanged. Collateral loan amounts are determined according to other factors as well, such as product demand and the condition of the specific item at issue.

14.    When customers bring an item to Pawn America for a collateral loan, Pawn America's workers inspect the item to determine its value. There is no minimum dollar amount on a collateral loan transaction, but the maximum amount is often established by state laws. The

4

customer's item is returned when his or her loan is paid off or, alternatively, the item can be surrendered by the customer as payment of his or her loan in full.

15. Should a customer choose to accept a collateral loan offered by Pawn America, the customer receives cash immediately and agrees upon a set period of time in which to repay the loan. When the customer returns to pay the balance of the loan, Pawn America immediately returns the item that served as the loan's collateral.

16. While a customer's collateral is in Pawn America's possession, the customer still owns the item and it is Pawn America's responsibility to keep the item safe and in good condition. Pawn America is fully insured for the loan value of each item that it holds as collateral.

**C.   PAWN AMERICA'S RAPID GROWTH AND SPECIFIC CHALLENGES**

17. In addition to experiencing the challenges familiar to most retailers, as described above, Pawn America has also recently faced challenges specific to its stores and operations.

18. During the first two decades of its existence, Pawn America's growth was consistent and rapid, both in terms of revenue and in terms of geographic expansion. Pawn America continued to experience strong growth even after e-commerce became a prevalent force in retail. In 2009, 2010, 2011, and 2012, Pawn America received the "Growth 50" award from the Minneapolis/St. Paul Business Journal because it was one of the fastest growing companies in the Twin Cities metro area. During those four years, Pawn America's consolidated annual revenues grew from $35,680,940 to $74,081,375.

19. Encouraged by its rapid and consistent growth, and my belief that such growth would continue, Pawn America continued to pursue an aggressive growth strategy and began opening increasingly larger stores as well.

5

20. Pawn America sought to increase its profit margins by increasing the number of traditionally high-margin transactions, even if doing so would decrease the volume of lower-margin transactions. This practice was expected, over time, to result in significant increases in net income.

21. The strategy did not work as intended. Although we successfully increased profit margins, we also experienced a larger-than-expected drop in the number of lower-margin transactions – and thus a significant reduction in revenues overall that caused cash flow challenges and an increasing inability to service debt.

22. These reductions in revenue also resulted in a higher rate of worker turnover in stores because workers were making less money through commissions and bonuses. Skilled workers are particularly crucial to a pawn retailer because the ability to value accurately a broad range of pre-owned merchandise can only be developed through years of experience. Given this reality, I believe it is likely that increases in employee turnover have resulted in decreased profits.

23. In addition to struggling to fund the costs associated with rapid growth and increased store size, overcoming poorly-timed strategic choices, and fighting against constriction in the retail sector generally, Pawn America was also saddled with unexpected costs in recent years.

24. In 2010 and 2011, Pawn America began working with Micros Systems to update and streamline its global software system relating to several key operational functions, including point of sale, inventory management, purchasing, and retail. After significant delays at the outset, and after investing millions in costs and internal resources into the development and customization of the new software, in 2014, Micros was purchased by Oracle and the project

6

suffered further delays as a result. Overall, the software development and implementation project cost Pawn America approximately $3 million over the course of six years (not to mention the toll that the initiative took on the allocation of internal resources). Pawn America also lost hundreds of thousands of dollars in sales from December 2016 through March 2017 due to software glitches that threatened to undermine Pawn America's e-commerce efforts very seriously. At this point, the software solution is close to completion, associated costs are relatively small, major glitches in the software have been addressed, and I believe that the completion of the software implementation will greatly streamline Pawn America's operations, decrease overhead, and increase profits.

25.    Pawn America has also increased its e-commerce and website-based sales, and those efforts provide reasons for optimism going forward. Our e-commerce initiatives now generate between $600,000 and $700,000 in sales monthly. Unfortunately, Pawn America was also recently forced to invest between $200,000 and $300,000 to retool and rebuild its website because the platform supporting it was suddenly and unexpectedly unsupported. Pawn America's website is up and running again, however, and we believe that website-based sales will continue to grow.

26.    In addition to the above, two Pawn America stores that have historically performed well suffered large reductions in revenue due to forces outside of management's control. The Pawn America store in Fargo, North Dakota, had a competitor open a location across the street and, due to the layout of the streets and parking areas, prospective customers must now drive past the competitor's storefront to reach Pawn America's store. Similarly, Pawn America's location in the midway area of St. Paul became very difficult to access for an extended period of time due to construction of the light rail.

CORE/2016737.0030/132558787.1

27. The consequences of these events were significant: Pawn America's Fargo location generated net income of $368,618 in 2014, but operated at a net loss in 2016, and Pawn America's midway location (a formerly-profitable location) operated at a net loss of nearly $250,000 in 2016.

### D.  CORPORATE AND CAPITAL STRUCTURE

28. Pawn America's basic corporate ownership is structured as follows:

   a. Pawn America Minnesota, LLC owns and operates all Pawn America stores located in Minnesota, as well as the Pawn America stores located in Fargo, North Dakota and Sioux Falls, South Dakota. I am the President, Chief Manager, Secretary, Treasurer, and Sole Governor of Pawn America Minnesota, LLC. Ninety-nine percent of Pawn America Minnesota, LLC's membership units are owned by the Pawn America Family Limited Partnership and one percent of Pawn America Minnesota, LLC's membership units are owned by PAL Minnesota Ltd. I am the sole shareholder and President of PAL Minnesota Ltd. Pursuant to corporate ownership agreements, PAL Minnesota Ltd. exercises exclusive control over the appointment and oversight of governors and managers at the Pawn America Minnesota, LLC level.

   b. As its name suggests, Pawn America Wisconsin, LLC owns and operates all Pawn America stores located in Wisconsin. I am the President, Chief Manager, Secretary, Treasurer, and Sole Governor of Pawn America Wisconsin, LLC. Like Pawn America Minnesota, LLC, ninety-nine percent of Pawn America Wisconsin, LLC's membership units are owned by the Pawn America Family Limited Partnership and one percent of Pawn America Wisconsin, LLC's membership units are owned by PAL Minnesota Ltd. I am the sole shareholder and President of PAL Minnesota Ltd. Pursuant

8

to corporate ownership agreements, PAL Minnesota Ltd. exercises exclusive control over the appointment and oversight of governors and managers at the Pawn America Wisconsin, LLC level.

    c.    Exchange Street, Inc. owns and operates a PA Exchange store located in Hopkins, Minnesota. I am the Sole Director, President, Secretary, and Treasurer of Exchange Street, Inc. Exchange Street, Inc. has 800,000 shares of outstanding stock and those shares are held as follows:

        i.    404,000 (50.5%) shares of Exchange Street, Inc. are held directly by me, Bradley K. Rixmann.

        ii.    198,000 (24.75%) shares of Exchange Street, Inc. are held by Amy Regnier.

        iii.    198,000 (24.75%) shares of Exchange Street, Inc. are held by Paul Rixmann.

29.    An organizational chart is attached as **Exhibit A** to this Declaration.

30.    As of the Petition Date, the Pawn America entities have consolidated outstanding debt obligations in the aggregate principal amount of approximately $15.8 million (including outstanding, unsecured payables and unpaid payroll obligations), primarily consisting of the TBK Loan (as defined below).

**1.    The TBK Loan**

31.    All three Debtors are direct borrowers on an Amended and Restated Loan Agreement dated as of July 12, 2013, as amended on each of June 1, 2014, August 30, 2014, August 30, 2015, February 28, 2016, July 1, 2016, September 16, 2016, and January 7, 2017 (the

"TBK Loan"), by and among the Debtors and TBK Bank, SSB, a Texas state savings bank, successor by merger to Triumph Community Bank, N.A., a national banking association, f/k/a THE National Bank, N.A. ("TBK Bank"). The TBK Loan serves as the Debtors' revolving, operating credit line and the Debtors' primary source of funds to supplement operating capital generated by the Debtors' business operations. The TBK Loan is secured by, among other things, a blanket lien on all of the Debtors' assets. The lien held by TBK Bank in connection with the TBK Loan is in first position with respect to nearly all of the Debtors' assets, but TBK Bank's lien is in second position with respect to certain furniture, fixtures, and equipment located at the Pawn America store in Hopkins, Minnesota. The furniture, fixtures, and equipment in the Hopkins store serve as collateral for the Venture Bank Loan (as defined below), and Venture Bank holds a first position security interest on such furniture, fixtures, and equipment. The balance on the TBK Loan was approximately $10.525 million as of the Petition Date.

 2. **The Venture Bank Loan**

 32. On May 24, 2013, Pawn America Minnesota, LLC entered into a Business Loan Agreement with Venture Bank pursuant to which Pawn America Minnesota, LLC received funds to finance the purchase of furniture, fixtures, and equipment to be installed at Pawn America Minnesota, LLC's store location in Hopkins, Minnesota (the "Venture Bank Loan"). The general terms of the Venture Bank Loan include a seven year term and amortization and a variable interest rate of Prime plus 1.000%. The Venture Bank Loan is secured by a commercial security agreement, dated May, 24, 2013. An intercreditor agreement between TBK Bank and Venture Bank, dated May 24, 2013, clarifies that Venture Bank's collateral for the Venture Bank loan is limited to specific furniture, fixtures, and equipment, but that Venture Bank's lien on those specific items would be prior and superior to any lien held by TBK Bank in the same. Venture

10

Bank's lien does not extend to Pawn America's accounts receivable, cash, inventory, or the proceeds of any of the foregoing. Pawn America is current on its payments under the Venture Bank Loan and the outstanding balance of the Venture Bank Loan was approximately $289,592 as of the Petition Date.

### 3. The Western Bank Loan

33. On July 12, 2012, Pawn America Minnesota, LLC executed an advancing term promissory note in the principal amount of $700,000 in favor of Western Bank, then a Minnesota state banking corporation (the "Western Bank Loan").[1] The purpose of the Western Bank Loan was to finance a portion of tenant improvements, furniture, fixtures, machinery, and equipment located at Pawn America Minnesota, LLC's location in Inver Grove Heights, Minnesota. The general terms of the Western Bank Loan include a nine (9) year term, a nine (9) year amortization, an interest rate that would remain fixed for five (5) years at 5.06%, then adjust to a rate equal to 3.6% over the Federal Home Loan Bank of Des Moines fixed rate. The Western Bank Loan is secured by a Third Party Mortgage, Security Agreement, Fixture Financing Statement, and Assignment of Leases and Rents, dated July 12, 2012, and executed by Pawn America's non-debtor affiliate, RFP, LLC, as mortgagor. The Western Bank Loan is not secured by a lien on any of the Debtors' property. Pawn America is current on its payments under the Western Bank Loan and the outstanding balance of the Western Bank Loan was approximately $378,526.00 as of the Petition Date.

---

[1] According to information available on its website (https://www.western-bank.com/), Western Bank is now a division of American National Bank in Minnesota.

### 4. The Capital Leases

34. The Pawn America entities are parties to multiple capital leases with lessors including Lease Finance Corp., MidCountry Equipment Finance, and KLC Financial. Several of the capital leases were entered into to supply furniture, fixtures, and equipment to Pawn America stores and one such lease served as an alternative financing arrangement to fund software-related expenditures.

### E. LENDER DISCUSSIONS AND EQUITY INFUSION

35. Pawn America's relationship with THE National Bank, a predecessor TBK Bank, began in January 2007. The first several years of the relationship spanned a period of rapid, consistent growth for Pawn America.

36. In July 2013, TBK Bank and Pawn America amended and restated their loan agreement and extended the maturity date of the TBK Loan to June 1, 2014.

37. In June 2014, TBK Bank and Pawn America entered into a first amendment to the amended and restated documents and further extended the term through August 30, 2014. At the time, the credit line was capped at $16 million.

38. By the time the next maturity date came around, Pawn America's financial outlook was not as strong as it had been in prior years. In August 2014, TBK Bank and Pawn America entered into a second amendment to the amended and restated documents and further extended the term through August 30, 2015. Despite the fact that Pawn America was still within its covenants on the TBK Loan, as conditions to the second amendment, TBK Bank required (a) additional collateral in the form of a pledge of a $4,000,000 life insurance policy on Brad Rixmann, (b) restrictions on payments or distributions to the members/shareholders of the debtors, (c) restrictions on transactions with affiliates, (d) increased tangible net worth

requirement, and (e) limitations on capital expenditures. The line remained capped at $16 million, however.

39. On August 30, 2015, TBK Bank and Pawn America entered into a third amendment to the TBK Loan that extended the maturity date for just six months – through February 28, 2016. At that point, TBK reduced the loan amount to $13 million, further restricted payments to, and transactions with related parties, and further restricted capital expenditures throughout all three companies.

40. On February 28, 2016, TBK and Pawn America entered into a fourth amendment in which TBK Bank further restricted Pawn America's borrowing base, further reduced the credit line to $12 million, eliminated any payments or distributions to the members/shareholders, further restricted covenant ratios, and further limited capital expenditures. The fourth amendment extended the maturity date of the TBK Loan for just four months—through July 1, 2016.

41. In March 2016, in order to cure a debt service coverage ratio default, the members/shareholders of the debtors contributed an additional $1,075,000, in equity to the debtors.

42. On July 1, 2016, Pawn America and TBK Bank entered into a fifth amendment to the TBK Loan that extended the maturity date for just four months—through October 31, 2016. At that point, Pawn America's ownership agreed to make an equity contribution of $800,000. In exchange, TBK Bank waived a debt service coverage ratio default, lowered the debt service coverage ratio from 1.3:1 to 1.1:1. But TBK Bank also reduced Pawn America's loan limit to $11.2 million and further restricted capital expenditures.

43. The parties entered a sixth amendment on September 16, 2016 that extended the term of the TBK Loan through January 7, 2017. In connection with the sixth amendment, TBK

Bank required Pawn America to retain a third-party business management consultant, and Pawn American retained Alliance Management. Additionally, TBK Bank further restricted rent payments to any related party landlords.

44. Finally, on January 7, 2017, TBK Bank and Pawn America entered into a seventh amendment to the amended and restated TBK Loan. TBK Bank imposed several additional terms in connection with the seventh amendment. Among other things, TBK Bank further restricted Pawn America's borrowing base, imposed a maximum advance limit on Pawn America's customer loans, imposed limits on advertising expenditures, and required Pawn America to: (i) close a large store in St. Paul, Minnesota; (ii) terminate twenty full-time sales employees; (iii) term out aged receivables; (iv) reduce overall inventory; and (v) renegotiate real property leases.

45. At various points in the above history, Pawn America engaged in serious efforts to find a replacement lender. Pawn America had extensive and prolonged discussions with multiple financial institutions in the course of these efforts, but we were unsuccessful at finding an alternative source of credit. Prior to their bankruptcy filings, the Pawn America entities also attempted to secure additional credit on an unsecured basis with assistance from Alliance Management. Unfortunately these efforts were also unsuccessful.

46. In addition to the $1.075 million equity contribution in March 2016, owners also made equity contributions to stay within covenants in the following amounts in the following months:

| February 2015 | $400,000 |
| March 2015 | $200,000 |
| April 2015 | $175,000 |
| May 2015 | $1,225,000 |
| June 2015 | $275,000 |
| August 2015 | $225,000 |

CORE/2016737.0030/132558787.1

| Total | $2,500,000 |
|---|---|

## F. REAL PROPERTY LEASES

47. Pawn America does not own any real property, but Pawn America leases real property at each of its store locations and to serve its corporate and administrative functions (collectively the "Real Property Leases"). A listing of the Real Property Leases is set forth in the schedules, and includes landlord information and other details relating to the specific leases entered into by the Debtors.

48. RFP, LLC is the landlord on several of the Real Property Leases. RFP, LLC is an affiliate of the Pawn America entities.

49. Another non-debtor affiliate – Payday America, Inc. – subleases space at a subset of Pawn America Minnesota, LLC's store locations. Payday America, Inc. operates a wholly-distinct, Chapter 53 lending operation out of such stores. Payday America is not a debtor in these chapter 11 cases.

## G. PAYROLL AND BENEFITS

50. Pawn America does not have direct employees. All employees, for each of the Pawn America entities, are hired and paid by an entity called PAL Management, Inc. I am the President of PAL Management, Inc., and three of the four entities that own Exchange Street, Inc. also hold all of the outstanding shares of PAL Management, Inc.[2]

---

[2] The outstanding shares of PAL Management, Inc. are held by the following entities in the following amounts: The Mary E. Rixmann Irrevocable Trust for the Benefit of Bradley K. Rixmann dated December 13, 1996 holds 1,010,000 shares; The Mary E. Rixmann Irrevocable Trust for the Benefit of Amy Regnier dated December 13, 1996 holds 495,000 shares; and The Mary E. Rixmann Irrevocable Trust for the Benefit of Paul Rixmann dated December 13, 1996 holds 495,000 shares.

CORE/2016737.0030/132558787.1

51. PAL Management, Inc. provides each of the Pawn America entities with all management, administrative, and employment services requested by each Pawn America entity, which can include, among other things:

    a. Providing personnel in the financial, operational, technical, managerial, and administrative areas;

    b. Human resources management;

    c. Centralized accounting, payroll, tax management, record keeping services and management of accounts receivable and accounts payable;

    d. Coordination of legal services;

    e. Management of information services;

    f. Development and coordination of marketing plans and initiatives;

    g. Property and equipment management;

    h. Administration and coordination of insurance-related issues; and

    i. Management of special projects.

52. Workers are paid by PAL Management, Inc. bi-weekly on roughly a one-week delay (for example, a payroll period will end on April 12, 2017, but workers will not be paid for that bi-weekly period until April 18, 2017). Every two weeks, at some point before payroll is distributed to workers, Pawn America transfers funds sufficient to cover its entire, aggregate payroll obligation to a separate bank account held by PAL Management, Inc. PAL Management, Inc. then distributes payroll to all workers from that separate account. PAL Management, Inc. also processes and administers all benefit-related programs and payments to all Pawn America workers, including health and dental benefits and accrued vacation, among other things.

CORE/2016737.0030/132558787.1

**H.     DEPOSITORY ACCOUNTS**

53.     Pawn America has three depository accounts. The first, its primary checking account, is located at TBK Bank (the "TBK Account"). Vendor obligations and daily operational expenses for all Pawn America entities are funded from the TBK Account. The balance of the TBK Account on the date of Pawn America's bankruptcy filing was $162,769.02.

54.     Pawn America also maintains a depository, checking account at U.S. Bank National Association (the "US Bank Account"). The US Bank account functions as a repository for deposits from store locations and checks to customers, and certain other obligations including payroll transfers to PAL Management, Inc., are funded from the US Bank Account. The balance of the US Bank Account on the date of Pawn America's bankruptcy filing was $325,840.86.

55.     Pawn America's third account, which is also a checking account maintained at U.S. Bank (the "ESP Account"), serves the extended service plan that we offer to customers. When customers buy something from Pawn America, they have the option of purchasing an extended service plan to cover repairs. Pawn America is required to reserve forty percent (40%) of the total outstanding on extended service plans. The ESP Account holds this reserve and, $79.368.20.

**I.     TIMING AND STRATEGY IN CHAPTER 11**

56.     Pawn America intends to move through the bankruptcy process and confirm a viable plan of reorganization as quickly and efficiently as it can. Pawn America believes this will be possible because its anticipated strategy is simple.

57.     The majority of Pawn America's locations remain viable from a cash flow perspective and we believe that another sizable subset of stores can be made financially viable

with reasonable readjustments to unsecured debt obligations and modest reductions to fixed costs. The bankruptcy process provides Pawn America with the tools to accomplish these goals.

58. The bankruptcy filings are an unfortunate necessity, but this process promises to put Pawn America back on a profitable track. Our entire management team is more committed than ever to overcoming the challenges in our path to build a stronger business for our customers, workers, and other stakeholders. We understand that we will have to make tough decisions, but we believe that Pawn America will emerge from this process stronger and better able to compete in the marketplace for decades to come.

Dated: April 12, 2017

Signed: _____
Bradley K. Rixmann